1
2
3
4
5
6
7
8                 UNITED STATES DISTRICT COURT
9               EASTERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11   MICHELLE (aka MYCHAL) CONCEPCION, | Case No. 1:18-cv-01743-NONE-JLT (PC) |
| 12               Plaintiff, | **FINDINGS AND RECOMMENDATIONS TO DENY DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| 13      v. | |
| 14 | (Doc. 27) |
| 15   CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al., | 21-DAY DEADLINE |
| 16               Defendants. | |
| 17 | |

18
19      Before the Court is Defendants' motion to dismiss. (Doc. 27.) For the reasons set forth below, the Court recommends that the motion be denied.

20
## I.    BACKGROUND
21
22      This action stems from the denial of Plaintiff's request for sex reassignment surgery ("SRS")[1] by the California Department of Corrections and Rehabilitation ("CDCR"). (*See* Doc.
23
15 at 2-3.) Plaintiff's operative claims are (1) deliberate indifference to serious medical needs in
24
violation of the Eighth Amendment against Defendant Diaz in his official capacity as secretary of
25
CDCR, pursuant to 42 U.S.C. § 1983, (2) denial of equal protection of the law in violation of the
26

27 _____
[1] California Correctional Health Care Services ("CCHCS") refers to SRS as gender affirming surgery. *See, e.g.*, Supplement to CCHCS/DHCS Care Guide: Gender Dysphoria (Dec. 2018), Cal. Corr. Health Care Servs., https://cchcs.ca.gov/wp-content/uploads/sites/60/CG/Guidelines-ReviewRequestsGender-Affirming-Surgery.pdf. The Court utilizes the terminology used by Plaintiff in his complaint.
28

1  Fourteenth Amendment against Defendant Diaz in his official capacity, pursuant to section 1983,

2  and (3) violation of the antidiscrimination provision of the Patient Protection and Affordable Care

3  Act ("ACA") against Defendants CDCR and CCHCS. (Docs. 16, 19, 24.)

4       Defendants move to dismiss the complaint on the grounds that (a) Plaintiff fails to state a

5  cognizable claim against Defendant Diaz in his official capacity, (b) Plaintiff fails to state a

6  cognizable claim under the ACA, (c) Plaintiff's constitutional and ACA claims are moot, (d)

7  Plaintiff's request for injunctive relief is barred by the class action of *Plata, et al. v. Newsom, et*

8  *al.*, No. 4:01-cv-01351-JST (N.D. Cal.) ("*Plata*"), and (e) CDCR and CCHS are immune from

9  suit. (Doc. 27-1 at 8.)

10       In their reply to Plaintiff's opposition, Defendants raised for the first time the "question of

11  whether the Court has subject-matter jurisdiction over Plaintiff's claim for injunctive relief."

12  (Doc. 38.) The Court requested supplemental briefing on the matter (Doc. 41), which the parties

13  have now provided (Docs. 42-43, 46).

14  **II.    LEGAL STANDARDS**

15       A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

16  sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In resolving a Rule

17  12(b)(6) motion, the Court's review is generally limited to the "allegations contained in the

18  pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."

19  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030-31 (9th Cir. 2008) (internal

20  quotation marks and citations omitted). Dismissal is proper if there is a "lack of a cognizable legal

21  theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v.*

22  *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988) (citation omitted).

23       "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

24  accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

25  U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court

26  "accept[s] as true all well-pleaded allegations of material fact, and construe[s] them in the light

27  most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998

28  (9th Cir. 2010) (citation omitted). In addition, the Court construes pleadings of *pro se* prisoners

2

1   liberally and affords them the benefit of any doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir.

2   2010) (citation omitted). However, "the liberal pleading standard … applies only to a plaintiff's

3   factual allegations," not his legal theories. *Neitze v. Williams*, 490 U.S. 319, 330 n.9 (1989).

### III.   MATERIALS OUTSIDE THE PLEADINGS

5   "Generally, district courts may not consider material outside the pleadings when assessing

6   the sufficiency of a complaint under Rule 12(b)(6) . . ." *Khoja v. Orexigen Therapeutics, Inc.*, 899

7   F.3d 988, 998 (9th Cir. 2018) (citation omitted). "There are two exceptions to this rule: the

8   incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Id.*

9   Defendants invite the Court to consider materials outside the complaint under both Rule 201 and

10   the incorporation-by-reference doctrine. (*See* Doc. 27-1 at 15-16; Doc. 27-2 at 2-3.)

### A.   Judicial Notice

12   Defendants request that the Court take judicial notice of the following records: (1) a

13   memorandum issued on October 3, 2016, by the Headquarters Utilization Management

14   Committee ("HUMC") regarding Plaintiff's request for SRS; (2) a memorandum issued on

15   September 8, 2016, by the Sex Reassignment Surgery Review Committee ("SRSRC") regarding

16   Plaintiff's request for SRS; (3) an institutional evaluation of Plaintiff's request for SRS; (4) the

17   Supplement to CCHCS/DHCS Care Guide: Gender Dysphoria—Guidelines for Review of

18   Requests for Sex Reassignment Surgery, issued in May of 2016 ("SRS Guidelines"); (5) the

19   Supplement to CCHCS/DHCS Care Guide: Gender Dysphoria—Guidelines for Review of

20   Requests for Gender Affirming Surgery, issued in December of 2018; (6) the First Amended

21   Complaint in *Plata*, filed on August 20, 2001; (7) the Stipulation for Injunctive Relief in *Plata*,

22   filed on June 13, 2002; (8) the Order Appointing Receiver in *Plata*, filed on February 14, 2006;

23   and (9) the Thirty-first Tri-Annual Report of the Federal Receiver in *Plata*, filed on February 1,

24   2016. (Doc. 27-2 at 2-3.)

25   Plaintiff does not object to the request for judicial notice of the CCHCS/DHCS guidelines

26   or the *Plata* filings. (*See* Doc. 35.) The Court therefore takes judicial notice of these records

27   pursuant to Federal Rule of Evidence 201. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223

28   n.2 (9th Cir. 2004) (court "may take judicial notice of a record of a state agency not subject to

1    reasonable dispute"); *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (court "may take

2    notice of proceedings in other courts").

3    Plaintiff objects to the request for judicial notice of the HUMC memo, the SRSRC memo,

4    and the institutional evaluation of Plaintiff's request for SRS. (Doc. 35.) Plaintiff contends that

5    "Defendants improperly seek judicial notice of these three documents containing disputed facts in

6    an improper effort to present their own version of facts at the pleading stage." (*Id.* at 3.) The

7    Court agrees that taking judicial notice of the facts that Defendants seek to establish would be

8    inappropriate.

9    Rule 201 provides that "[t]he court may judicially notice a fact that is not subject to

10   reasonable dispute because it . . . (1) is generally known within the trial court's territorial

11   jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

12   reasonably be questioned." Fed. R. Evid. 201(b). As Defendants state, "court[s] may . . . take

13   judicial notice of administrative records" as well as the "official records of the California

14   Department of Corrections and Rehabilitation." (Doc. 27-2 at 1-2.) In *Mack v. S. Bay Beer*

15   *Distributors, Inc.*, for example, the court took judicial notice of records from a state

16   administrative hearing on unemployment benefits. 798 F.2d 1279, 1281-82 (9th Cir. 1986). In

17   *Brown v. Valoff*, the court took judicial notice of CDCR's Department Operations Manual

18   ("DOM"). 422 F.3d 926, 931 n.7 (9th Cir. 2005). However, "[j]ust because [a] document itself is

19   susceptible to judicial notice does not mean that every assertion of fact within that document is

20   judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. Although a court may "take judicial

21   notice of undisputed matters of public record," it may not take judicial notice of reasonably

22   disputed facts simply because they are "stated in [a] public record[]." *Lee v. City of Los Angeles*,

23   250 F.3d 668, 689-90 (9th Cir. 2001).

24   In *Brown*, the Ninth Circuit judicially noticed CDCR's DOM for the purpose of

25   establishing department policies and procedures. 422 F.3d at 931 n.7. Taking judicial notice was

26   appropriate because the official policies and procedures of the department could "be accurately

27   and readily determined from" its own operations manual, which is a "source[] whose accuracy

28   cannot reasonably be questioned."  In *Mack*, the district court judicially noticed the administrative

1    hearing records for the purpose of determining whether the results of the hearing had a collateral

2    estoppel effect on the plaintiff's age discrimination claim in federal court. 798 F.2d at 1282. The

3    court did not judicially notice the facts asserted within the records for their truth but, rather, to

4    determine what administrative findings had been made at the hearing.

5          On the other hand, in *Khoja*, the district court judicially noticed an investors' conference

6    call transcript that the defendant submitted with an SEC filing. 899 F.3d at 999. Although "[a]n

7    investor call transcript submitted to the SEC generally qualifies as a 'source[ ] whose accuracy

8    cannot reasonably be questioned," the Ninth Circuit held that the district court erred by judicially

9    noticing facts that could not be accurately determined from the transcript, namely, what investors

10   knew about the status of a drug study conducted by the defendant. *Id.* at 994, 999-1000 (citations

11   omitted). As the Ninth Circuit noted, "[i]t is improper to judicially notice a transcript when the

12   substance of the transcript is subject to varying interpretations, and there is a reasonable dispute

13   as to what the [transcript] establishes." *Id.* at 1000 (internal quotation marks and citation omitted).

14         Thus, to rule on Defendants' request for judicial notice of the HUMC memo, the SRSRC

15   memo, and the institutional evaluation, it is necessary to determine which facts Defendants seek

16   to establish from these records. Defendants do not explicitly specify those facts, but from a

17   review of their motion to dismiss, it appears that the facts are the following: (1) based on the

18   SRSRC memo, Plaintiff does not have "significant distress related to gender dysphoria," (2)

19   based on the institutional evaluation, Plaintiff has had no adverse side effects from hormone

20   replacement therapy, and (3) based on all three documents, the HUMC denied Plaintiff's request

21   for SRS because it determined that SRS was not medically necessary. (*See* Doc. 27-1 at 15-16.)

22   These facts are not ones that are "generally known," and they are not ones that "can be accurately

23   and readily determined" from the documents.

24         The factual assertions are also directly contradicted by Plaintiff's allegations. In his first

25   amended complaint, Plaintiff describes in detail how hormone therapy has worsened his gender

26   dysphoria, such as by increasing his breast size and "worsening [his] menses symptoms," which

27   has caused him "extreme distress" and prompted him to "bind his chest." (Doc. 15 at 7-8.)

28   Plaintiff also explains how the HUMC denied his request for SRS without the aid of medically-

significant information. (*Id.* at 19-21.) For example, Plaintiff alleges that his primary care physician and psychologist were not allowed, as a matter of policy, to opine on whether surgery was medically necessary. (*Id.* at 19.) Though the HUMC and SRSRC memos and institutional evaluations may constitute evidence that refute Plaintiff's allegation that the HUMC failed to base its denial of SRS on an adequate medical determination, they are not sources that can readily and conclusively establish that fact. They also cannot readily and conclusively establish that Plaintiff has suffered no significant distress from gender dysphoria or adverse side effects from hormone therapy when Plaintiff is alleging the exact opposite. *See Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006) ("not . . . appropriate for the Court to take notice of disputed matters contained within . . . medical records") (citing *United States v. Burch*, 169 F.3d 666, 672 (10th Cir. 1999)).

Thus, the facts that Defendants seek to establish by reference to the HUMC memo, the SRSRC memo, and the institutional evaluation are subject to reasonable dispute, and they are strongly disputed in the present case. They are not facts "that only an unreasonable person would insist on disputing," such as a date in a calendar, a location on a map, or, as in *Brown*, a policy in an agency manual. *Walker*, 454 F. Supp. 2d at 1022; *Brown*, 422 F.3d at 933 n.7. Although the HUMC memo may theoretically be judicially noticeable for the fact that the HUMC denied Plaintiff's request for SRS, or for the date on which that denial occurred, it is not noticeable for the fact that the denial was based on an adequate medical determination. *See Khoja*, 899 F.3d at 999-1000 (judicial notice of call transcript to establish date of the call "would, in theory, be permissible . . . because that fact 'can be accurately and readily determined' from the transcript"). In the same way, though the Court may judicially notice the First Amended Complaint in *Plata*, as it has here, it may not judicially notice the facts asserted within that complaint for their truth. *See Lee*, 250 F.3d at 690 ("when a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein'"). Because Defendants request judicial notice of the HUMC memo, the SRSRC memo, and the institutional evaluation for the purpose of establishing reasonably disputed facts, the Court denies the request.

///

6

**B.  Incorporation by Reference**

Defendants also argue that the Court may consider the HUMC and SRSRC memos and the institutional evaluation under the incorporation-by-reference doctrine. (Doc. 27-1 at 15-16.)

"[A] defendant may seek to incorporate a document into the complaint if the plaintiff refers extensively to the document *or* the document forms the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002 (internal quotation marks and citation omitted) (emphasis added). Thus, "the mere mention of the existence of a document is insufficient to incorporate the contents of [the] document," but a document not referenced at all may still be incorporated if the plaintiff's "claim[s] necessarily depend[] on [it]." *Id.* (internal quotation marks and citations omitted).

For example, in *Knievel v. ESPN*, the plaintiffs alleged that a photograph and associated caption published on the defendant's website were defamatory. 393 F.3d 1068, 1070 (9th Cir. 2005). In support of its motion to dismiss, the defendant "submitted . . . surrounding photos and captions to show [that] a reasonable person would not view the caption at issue as defamatory." *Khoja*, 899 F.3d at 1002 (citing *Knievel*, 393 F.3d at 1073). Because a "defamation claim requires showing that the statement at issue, given its context, is capable of sustaining a defamatory meaning," the Ninth Circuit held that "it was proper to incorporate [the surrounding webpages] [since] the [plaintiffs'] claim necessarily depended on them." *Khoja*, 899 F.3d at 1002 (citing *Knievel*, 393 F.3d at 1073, 1076) (internal quotation marks and citation omitted).

Similarly, in *Parrino v. FHP, Inc.*, the Ninth Circuit affirmed the incorporation of the plaintiff's HMO "Master Group Application" in ruling on a motion to dismiss. 146 F.3d 699, 706 (9th Cir. 1998). There, the plaintiff alleged that the defendant improperly denied a claim for healthcare treatment. *Id.* at 702. The Ninth Circuit reasoned that, "[b]ecause [the plaintiff's] claims rest[ed] on his membership in [the HMO] plan and on the terms of the plan, documents governing plan membership, coverage, and administration [we]re essential to his complaint," which included the "Master Group Application." *Id.* at 706. Therefore, the district court's consideration of the document was proper. *Id.*

On the other hand, "if [a] document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint.

1   Otherwise, defendants could use the doctrine to insert their own version of events into the

2   complaint to defeat otherwise cognizable claims." *Khoja*, 899 F.3d 1002. Relatedly, "it is

3   improper to assume the truth of an incorporated document if such assumptions only serve to

4   dispute facts stated in a well-pleaded complaint." *Id.* at 1003.

5          With these principles in mind, the Court does not find that incorporation of the HUMC

6   memo, the SRSRC memo, or the institutional evaluation is proper. First, Plaintiff does not refer to

7   these documents "extensively." He refers to the HUMC memo only once, quoting two sentences,

8   and he mentions the institutional evaluation only once. (Doc. 15 at 19.) Such references are not

9   "extensive." *Khoja*, 899 F.3d at 1003 ("'extensively'. . . ordinarily . . . mean[s] more than once,"

10  unless a "single reference is relatively lengthy") (citation omitted). Plaintiff does not mention the

11  SRSRC memo at all.

12         Second, Plaintiff's claims do not "necessarily depend" or rely on these documents. His

13  claims concern whether prison officials were deliberately indifferent to his gender dysphoria,

14  denied him equal protection, and violated the ACA when they refused his request for SRS.

15  Although Plaintiff mentions the HUMC memo to support these claims—specifically, he argues

16  that the HUMC's use of the wrong gender pronoun evidences the committee's "incompetence

17  regarding . . . gender dysphoria" (Doc. 15 at 19)—the claims do not *depend* on the contents of the

18  memo or other disputed documents. This is different from the defamation claim in *Knievel*, which

19  necessarily depended on the contents of the defendants' webpages, and the insurance claim in

20  *Parrino*, which depended on the contents of the plaintiff's HMO plan.

21         Even if the Court were to consider the disputed documents, it could not assume the truth

22  of every statement therein without improperly "resolving factual disputes at the pleading stage."

23  *Khoja*, 899 F.3d at 1003. As explained in the Court's discussion on judicial notice, Defendants

24  invite the Court to consider the HUMC and SRSRC memos and the institutional evaluation for

25  the purpose of establishing that (1) the HUMC denied Plaintiff's request for SRS because it was

26  medically unnecessary, (2) Plaintiff does not suffer from significant distress related to gender

27  dysphoria, and (3) Plaintiff has had no adverse side effects from hormone therapy. (*See* Doc. 27-1

28  at 15-16.) This goes "beyond testing the sufficiency of [Plaintiff's] claims and into the realm of

8

1   factual disputes." *Khoja*, 899 F.3d at 1006. The Ninth Circuit has warned against engaging in this

2   practice under the guise of judicial notice or the incorporation-by-reference doctrine. *Id.* at 998-99

3   ("If defendants are permitted to present their own version of the facts at the pleading stage—and

4   district courts accept those facts as uncontroverted and true—it becomes near impossible for even

5   the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief.") (citations

6   omitted). The Court therefore declines to consider the HUMC and SRSRC memos and the

7   institutional evaluation in reviewing Defendants' motion to dismiss.

8   **IV.    PLAINTIFF'S FACTUAL ALLEGATIONS**

9       Without the incorporation of the above-disputed documents, the factual allegations in

10  Plaintiff's complaint are the following:

11      **A.   CDCR and CCHCS Policies**

12      In 2016, CDCR and CCHCS created the SRS Guidelines. (Doc. 15 at 13.) The SRS

13  Guidelines were the "CDCR's and CCHCS's operative policy for evaluating requests for SRS

14  when Plaintiff was denied SRS," and they apply only to patients suffering from gender dysphoria.

15  (*Id.* at 13, 14.)

16      According to the SRS Guidelines, when a prisoner requests SRS, the Institution

17  Utilization Management Committee (IUMC) at the prisoner's facility submits reports from

18  custody officials and other documentation to the HUMC. (*Id.* at 14.) The custody reports "may

19  include information about the prisoner's criminal history and 'CDCR performance.'" (*Id.*) After

20  the HUMC receives the request and information from the IUMC, it forwards it to the SRSRC for

21  a determination. (*Id.* at 15.) The SRSRC is comprised of six physicians and psychologists, who

22  need not be treating physicians of the patient whose request is under review, nor "competent in

23  the assessment, diagnosis or treatment of gender dysphoria." (*Id.*) For cisgender prisoners seeking

24  similar treatment (e.g., mastectomy, hysterectomy, ovariectomy, and vaginectomy), custody

25  reports would not play a role in the determination of whether to grant the treatment. (*Id.* at 15,

26  24.)

27      The SRS Guidelines contain eleven criteria to consider when reviewing SRS requests. For

28  example, the SRSRC must consider the prisoner's "post-operative placement" and whether he can

"transfer and adjust medically and psychologically to confinement." (*Id.* at 16-17.) The Standards of Care published by the World Professional Association for Transgender Health (WPATH) explicitly reject the consideration of "institutionalization or housing arrangements" when determining the proper treatment for gender dysphoria. (*Id.* at 10, 16-17.)

Per the SRS Guidelines, the SRSRC must reject requests from inmates who do not have at least two years remaining before their expected parole date, as well as requests from inmates who submitted an SRS request within the past year that was denied. (*Id.* at 16, 17.) Consequently, these non-medical factors are determinative of whether SRS is granted or denied, regardless of whether the surgery is medically necessary. (*Id.*) Cisgender inmates seeking similar treatment would not be disqualified for these reasons. (*Id.*)

**B.  California Regulations**

In August 2018, the CDCR published a temporary, emergency amendment to Title 15 of the California Code of Regulations. (*See id.* at 17.) Under these regulations, SRS requests must undergo the SRSRC review process provided in the SRS Guidelines. (*Id.*) The amendment prohibits the institution-level IUMCs and inmates' treating physicians and psychologists from opining on SRS requests. (*Id.* at 18.) For cisgender prisoners, the IUMCs and inmates' treating physicians may provide recommendations on whether outpatient treatment is medically necessary. (*Id.*)

**C.  Plaintiff's Medical Treatment**

Plaintiff is a transgender man and suffers from gender dysphoria. (*Id.* at 2, 7.) Since 2014, CDCR has provided him with hormone replacement therapy in the form of testosterone injections to treat his gender dysphoria. (*Id.* at 7.) The therapy has caused serious side effects that have aggravated his condition. (*Id.*) For instance, at times, Plaintiff's breast size has increased, and his menstrual symptoms have worsened, including "longer menstrual cycles, more painful cramping, and heavier menstrual flows." (*Id.* at 8.) These side effects have caused Plaintiff severe distress because his breast size and menstruation are characteristics and bodily processes that do not conform to his gender identify. (*Id.*) Furthermore, "Plaintiff's endocrinologist has opined that the testosterone may be converting to estradiol, which is 'concerning.'" (*Id.* at 9.)

1      For these reasons and others, according to Plaintiff, "SRS is medically necessary to treat

2  his gender dysphoria." (*Id.* at 21.) SRS is "widely accepted as a necessary treatment for severe

3  cases of gender dysphoria, including by the state Medicaid program, the federal Medicare

4  program," and the WPATH. (*Id.* at 10-11). According to the WPATH Standards of Care, "[w]hile

5  many . . . transgender . . . individuals find comfort with their gender identity . . . without surgery,

6  for many others surgery is . . . medically necessary to alleviate their gender dysphoria." (*Id.* at

7  11.)

8      In February 2016, Plaintiff's treating psychologist submitted the "CDCR Institutional

9  Evaluation for Consideration of Sex Reassignment Surgery" on Plaintiff's behalf. (*Id.* at 19.) In

10  April 2016, Plaintiff's primary care physician also submitted a request for SRS. (*Id.*) However,

11  per CDCR policy and state regulations, neither the psychologist nor the physician opined on

12  whether SRS was medically necessary for Plaintiff. (*Id.*)

13      On October 3, 2016, the SRSRC and HUMC denied Plaintiff's request. (*Id.*) In its denial,

14  the SRSRC stated, "the current treatment for gender dysphoria [i.e., hormone therapy] . . .

15  provide[s] significant relief that is adequate and sufficient for her . . . condition." (*Id.*) Contrary to

16  the prevailing medical and mental health literature, the SRSRC used the wrong gender pronoun in

17  referring to Plaintiff, and it did not address the documented, adverse side effects of the hormone

18  therapy on Plaintiff's health. (*Id.*) As a matter of CDCR policy, Plaintiff was then prohibited from

19  renewing his SRS request for one year. (*Id.* at 20.) Since the denial, Plaintiff's gender dysphoria

20  and related medical complications have worsened, and he "continues to suffer severe anxiety and

21  distress as a result of the discrepancy between his gender identity and his remaining sex

22  characteristics that do not conform to his gender identity." (*Id.* at 21.)

23  **V.   DEFENDANTS' MOTION TO DISMISS**

24      In their motion to dismiss, including their supplemental brief, Defendants argue that (1)

25  Plaintiff's claims are moot, (2) Plaintiff fails to state a cognizable official-capacity claim against

26  Defendant Diaz for either deliberate indifference or denial of equal protection, (3) Plaintiff fails to

27  state a cognizable claim under the ACA, (4) CDCR and CCHS are immune from suit, and (5)

28  Plaintiff's request for systemic injunctive relief is barred by the class action of *Plata, et al. v.*

1   *Newsom, et al.*, No. 4:01-cv-01351-JST (N.D. Cal.). (Doc. 27-1 at 8.) For the reasons below, the

2   Court finds that dismissal is not warranted on any of these grounds.

3   **A.   Mootness of Requested Relief**

4   Defendants argue that Plaintiff's claims for injunctive and declaratory relief are moot

5   because, "since filing this lawsuit, Plaintiff submitted a new request for [SRS], which was

6   approved on July 22, 2020." (Doc. 42 at 6.) Thus, Defendants claim, "Plaintiff is no longer

7   subjected to the alleged constitutional violation, and his injunctive relief claim . . . is moot." (*Id.*)

8   "Federal courts lack jurisdiction to consider moot questions . . . or to declare principles or

9   rules of law which cannot affect the matter in issue in the case before it." *Forest Guardians v.*

10  *Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (internal quotation marks and citations omitted). An

11  action or "claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v.*

12  *Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997) (citation omitted). "If an event

13  occurs that prevents the court from granting effective relief, the claim is moot and must be

14  dismissed." *Id.* (citation omitted). "The party asserting mootness bears the burden of establishing

15  that there is no effective relief remaining that the court could provide." *S. Oregon Barter Fair v.*

16  *Jackson Cty., Oregon,* 372 F.3d 1128, 1134 (9th Cir. 2004) (citation omitted). "That burden is

17  'heavy'; a case is not moot where *any* effective relief may be granted." *Forest Guardians*, 450

18  F.3d at 461 (citation omitted).

19  The Court finds that Plaintiff's claim for injunctive relief has not become moot for the

20  simple fact that his requested relief has not been provided. In his complaint, Plaintiff requests that

21  the Court "[e]nter injunctive relief enjoining Defendants to provide Plaintiff with medically

22  necessary surgery to treat his significant distress from gender dysphoria." (Doc. 15 at 27.)

23  According to a declaration submitted by the chair of CDCR's Gender Affirming Surgery Review

24  Committee, the Statewide Medical Authorization Review Team (SMART) approved Plaintiff's

25  request for a bilateral reduction mammoplasty on July 20, 2020. (Doc. 46-1 at 1-3.) However, as

26  Plaintiff points out, "[n]othing . . . in the record before the Court . . . suggests that Mr.

27  Concepcion has actually received any of the medical treatments he alleges Defendants are

28  unconstitutionally denying him." (Doc. 43 at 5.) Thus, although Plaintiff's claims are based on

1   prior denials of SRS, the fact that SMART has now approved SRS does not "establish[] that there

2   is no effective relief remaining that the court could provide." *S. Oregon Barter Fair*, 372 F.3d at

3   1134 (citation omitted).

4        In addition, the SMART memo to which Defendants refer does not specify which surgical

5   procedures have been approved. (*See* Doc. 38-1 at 4.) As Plaintiff indicates, it is therefore not

6   possible "to discern . . . whether all . . . medically necessary treatment has been approved." (Doc.

7   43 at 8.) Defendants counter by stating that "Plaintiff's [latest] surgery request that was . . .

8   approved by CDCR was . . . for a bilateral reduction mammoplasty only." (Doc. 46.) However,

9   this issue is not before the Court. As Defendants concede, "Plaintiff's complaint is silent as to the

10  specific surgical procedure . . . requested." (*Id.*) Indeed, in his complaint, Plaintiff generally

11  requests "medically necessary surgery" to treat his gender dysphoria. (Doc. 15 at 27.) Nothing

12  before the Court indicates that he has received such surgery, or that all necessary surgical

13  procedures have been approved. Therefore, the Court finds that Defendants have not met their

14  "heavy" burden of showing that no effective relief remains.

15       **B.  Deliberate Indifference**

16       "Prison officials violate the Eighth Amendment if they are 'deliberate[ly] indifferen[t] to

17  [a prisoner's] serious medical needs.'" *Peralta v. Dillard*, 744 F.3d 1076, 1081 (9th Cir. 2014)

18  (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "This is true whether the indifference is

19  manifested by prison doctors in their response to the prisoner's needs or by prison guards in

20  intentionally denying or delaying access to medical care. . . ." *Estelle*, 429 U.S. at 104-05. "A

21  medical need is serious if failure to treat it will result in significant injury or the unnecessary and

22  wanton infliction of pain." *Peralta*, 744 F.3d at 1081 (internal quotation marks and citations

23  omitted). "A prison official is deliberately indifferent to that need if he 'knows of and disregards

24  an excessive risk to inmate health.'" *Id.* at 1082 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837

25  (1994)).

26       The test for deliberate indifference to medical needs is two-pronged and has objective and

27  subjective components. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012). To establish

28  such a claim, a prisoner must first "show a serious medical need by demonstrating that failure to

13

1   treat [the] prisoner's condition could result in further significant injury or the unnecessary and

2   wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need

3   was deliberately indifferent." *Id.* (internal quotation marks and citation omitted).

4          In its screening order, the Court found that Plaintiff states a cognizable claim of deliberate

5   indifference. (Doc. 16 at 9.) The Court specifically found that "Plaintiff's allegations show that

6   'the only adequate medical treatment for [his] gender dysphoria is SRS, that the decision not to

7   address [his] persistent symptoms was medically unacceptable under the circumstances, and that

8   CDCR denied [him] the necessary treatment for reasons unrelated to [his] medical need.'" (*Id.*

9   (citation omitted).)

10         Defendants argue that Plaintiff's complaint fails to state a cognizable official-capacity

11  claim because CDCR's SRS policy was not "a moving force behind any Eighth Amendment

12  violation." (Doc. 27-1 at 17.) To state an official-capacity claim against a state official, "a

13  plaintiff [must] identify the law or policy challenged as a constitutional violation and name the

14  official within the entity who can appropriately respond to injunctive relief." *Hartmann v.*

15  *California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (citations omitted).

16  Defendants do not contend that Secretary Diaz is inappropriately named as a defendant, but they

17  argue that Plaintiff fails to show that any policy caused the Eighth Amendment violation of which

18  he complains. (*See* Doc. 27-1 at 15-17.)

19         Defendants' argument is based on factual assertions they glean from the HUMC memo,

20  the SRSRC memo, and the institutional evaluation. (*See id.*) Given that the Court has declined to

21  consider these documents at the pleading stage, *see* section III, *supra*, Defendants' argument fails.

22  Plaintiff provides ample factual allegations in his complaint to show that state regulations and

23  CDCR policies were moving forces behind the constitutional violations he allegedly suffered. For

24  example, Plaintiff alleges that, as a matter of policy, his treating psychologist and physician were

25  prohibited from opining on whether SRS was medically necessary for him, and that after the

26  HUMC denied his request for SRS, he was prohibited from renewing his request for one year,

27  regardless of medical necessity. (Doc. 15 at 19, 20-21.) Plaintiff also alleges that "the voting

28  members of the SRSRC are not required to be competent in the . . . diagnosis or treatment of

1    gender dysphoria." (*Id.* at 15.) These allegations are sufficient to state a cognizable official-

2    capacity claim.[2]

3        **C. Equal Protection**

4        "The Equal Protection Clause [of the Fourteenth Amendment] requires the State to treat

5    all similarly situated people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008)

6    (citation omitted). To state an equal protection claim, "a plaintiff must show that the defendants

7    acted with an intent or purpose to discriminate against the plaintiff based upon membership in a

8    protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citations omitted).

9    "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's

10   protected status." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (emphasis

11   removed) (citation omitted).

12       "The first step in equal protection analysis is to identify the state's classification of

13   groups." *Country Classic Dairies, Inc. v. State of Mont., Dep't of Commerce Milk Control*

14   *Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "To accomplish this, a plaintiff can show that the law

15   is applied in a discriminatory manner or imposes different burdens on different classes of people."

16   *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995).

17       "The next step . . . [is] to determine the level of scrutiny." *Country Classic Dairies*, 847

18   F.2d at 595. "Classifications based on race," for example, "are subject to strict scrutiny,"

19   *Freeman*, 68 F.3d at 1187, whereas classifications based on gender—and, in the Ninth Circuit,

20   transgender status—are subject to "intermediate scrutiny," *Navarro v. Block*, 72 F.3d 712, 716

21   (9th Cir. 1995) (citations omitted); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019).

22

---

23   [2] Even if the Court were to consider the HUMC memo, the SRSRC memo, and the institutional evaluation, it would
     reach the same conclusion. The documents do not refute Plaintiff's claims that, as a matter of policy, Plaintiff's

24   treating medical providers were prohibited from opining on the medical necessity of SRS; Plaintiff was prohibited
     from renewing his SRS request for one year, regardless of medical need; and the voting members of the SRSRC were

25   not competent in the diagnosis or treatment of gender dysphoria. The documents also confirm that the SRSRC, upon
     whose recommendation the HUMC based its decision, considered custodial (i.e., non-medical) reports in reviewing
     Plaintiff's request. (Doc. 27-2 at 5, 7.) The documents are also inconsistent. Although the SRSRC memo provides

26   that Plaintiff suffers from "no significant distress related to gender dysphoria," a report within the institutional
     evaluation provides that Plaintiff's gender dysphoria is "high" and that he "reports 'severe distress.'" (*Id.* at 18.) His

27   treating psychologist also states that "significant . . . dysphoria related to body image concerns plague [Plaintiff] on
     more days than not." (*Id.* at 21.)  Thus, the documents do not disprove Plaintiff's overarching contention that, due to

28   state policies, the HUMC's denial of Plaintiff's request for SRS was based on an unconstitutionally inadequate
     medical determination (or, more precisely, on factors unrelated to medical need).

1   Under intermediate scrutiny, "discrimination is . . . unconstitutional unless it is substantially

2   related to the achievement of an important governmental interest." *Hibbs v. Dep't of Human Res.*,

3   273 F.3d 844, 855 (9th Cir. 2001) (citation omitted). "[T]he burden is on the defender of such

4   discrimination to prove that the [appropriate] standard has been met." *Hibbs*, 273 F.3d at 855.

5       Plaintiff states a cognizable official-capacity claim for the denial of equal protection. He

6   alleges that transgender inmates seeking SRS are subject to more burdensome policies than

7   cisgender inmates seeking similar surgeries (e.g., mastectomy, hysterectomy, ovariectomy, and

8   vaginectomy), such as the requirement that the former wait at least one year after an SRS denial

9   before re-applying, the rule prohibiting inmates' treating medical providers from recommending

10  SRS, and the requirement that the SRSRC consider housing-related criteria as part of their review

11  of SRS requests. (Doc. 15 at 16-18.)

12      Defendants argue that Plaintiff fails to state a cognizable equal protection claim because

13  "a transgender man seeking sex-reassignment surgery . . . is not similarly situated to a cisgender

14  female inmate who is not being treated for gender dysphoria and is requesting the same surgeries

15  for other medical conditions." (Doc. 27-1 at 18.) In support of this argument, Defendants cite two

16  out-of-circuit cases, *Campbell v. Kallas*, No. 3:16-cv-00261-JDP, 2018 WL 2089351 (W.D. Wis.

17  2018) and *Williams v. Kelly*, No. 2:17-cv-12993, 2018 WL 4403381 (E.D. La. 2018). (*Id.* at 18-

18  19.) Based on these cases' reasoning, Defendants argue that "Plaintiff is not similarly situated to

19  cisgender inmates seeking the same surgeries because the inquiry into the medical necessity of

20  such surgeries is different. A man seeking a mastectomy to treat his . . . gender dysphoria must

21  undergo a different medical evaluation than a cisgender woman seeking a mastectomy or

22  hysterectomy to treat her . . . , for example, cancer." (*Id.* at 19.)

23      As an initial matter, Plaintiff does not contend that transgender inmates' requests for SRS

24  require identical medical determinations as cisgender inmates' requests for the same surgeries.

25  Rather, he contends that state policies require officials to consider *non*-medical factors in

26  reviewing transgender inmates' requests for SRS, and to disregard the medical opinions of their

27  treating physicians or psychologists, while not requiring the same for cisgender inmates' requests

28  for similar surgical procedures. (*See* Doc. 15 at 14-18.)

16

1    Second, a finding that transgender men requesting SRS "must undergo a different medical

2    evaluation" than cisgender women seeking similar procedures would require factual

3    determinations that the Court is not prepared to make at the pleading stage. It would seem more

4    appropriate to consider this issue in the context of addressing whether the alleged dissimilar

5    treatment of the groups is substantially related to an important governmental interest, as opposed

6    to treating the two topics as analytically divorced from each other. *See Tuan Anh Nguyen v.*

7    *I.N.S.*, 533 U.S. 53, 62-64, 73 (2001) (conducting "similarly situated" analysis in the context of

8    addressing whether a gender-based classification serves an important government interest).

9    Third, if the Court were to find that the groups are not similarly situated as a threshold

10   matter, it would conflict with the conclusion by this circuit's courts that heightened scrutiny

11   applies to discrimination based on transgender status, including in the prison context. *See, e.g.*,

12   *Karnoski*, 926 F.3d at 1200-02; *Crowder v. Diaz*, No. 2:17-cv-01657-TLN-DMC, 2019 WL

13   3892300, at *12 (E.D. Cal. 2019), *report and recommendation adopted*, 2019 WL 5566433 (E.D.

14   Cal. 2019); *Olive v. Harrington*, No. 1:15-cv-01276-BAM, 2016 WL 4899177, at *5 (E.D. Cal.

15   2016); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015). That is, if the groups

16   are deemed to not be similarly situated as a threshold matter, it would effectively bar the

17   application of heightened scrutiny to classifications based on transgender status.

18   Lastly, though the Court is not aware of another case in this circuit that has specifically

19   addressed the issue of whether the groups are similarly situated, courts in this circuit have

20   repeatedly held that inmates suffering gender dysphoria can state cognizable equal protection

21   claims based on the denial of SRS. *See, e.g.*, *Dotson v. Adams*, No. 1:17-cv-01199-BAM (E.D.

22   Cal. May 22, 2018); *McQueen v. Brown*, No. 2:15-cv-02544-JAM-AC, 2018 WL 1875631, at *3

23   (E.D. Cal. 2018), *report and recommendation adopted*, 2018 WL 2441713 (E.D. Cal. 2018);

24   *Denegal v. Farrell*, No. 1:15-cv-01251-DAD-MJS, 2017 WL 2363699, at *7 (E.D. Cal. 2017),

25   *report and recommendation adopted*, 2017 WL 4237099 (E.D. Cal. 2017); *Norsworthy*, 87 F.

26   Supp. 3d at 1120.

27   As described above, Plaintiff alleges that specific CDCR/CCHCS policies and state

28   regulations impose more burdensome requirements on transgender inmates seeking SRS than on

1   cisgender inmates seeking similar surgeries. The Court finds that these allegations state an equal

2   protection claim that is plausible on its face. *See Iqbal*, 556 U.S. at 678 (citation omitted).

3   **D.  Affordable Care Act**

4   Section 1557 of the ACA provides that "health programs or activities receiving federal

5   financial assistance are prohibited from discriminating against individuals on the basis of any

6   ground listed under four different civil rights statutes[,] including Title IX, which prohibits

7   discrimination on the basis of sex." *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp.

8   3d 1090, 1098 (S.D. Cal. 2017); 42 U.S.C. § 18116; 20 U.S.C. § 1681.

9   Defendants do not dispute that section 1557 prohibits discrimination based on transgender

10  status. (*See* Doc. 27-1 at 20.) But they argue that "the policy at issue here is not invidious or

11  discriminatory" because it "provides medically necessary surgical procedures for transgender

12  inmates suffering from gender dysphoria." (Doc. 27-1 at 20-21.)

13  Defendants' argument amounts to a factual assertion that is disputed by Plaintiff. As

14  described in the previous subsections, Plaintiff alleges that CDCR policies require state officials

15  to consider non-medical factors when reviewing requests for SRS by transgender inmates, and

16  prohibit medical providers from opining on such requests, while not requiring the same for

17  cisgender inmates' requests for similar surgeries. These policies, Plaintiff contends, result in

18  denials of requests for SRS even when SRS is medically necessary. The Court may not resolve

19  these factual disputes in ruling on a motion to dismiss. Based on the allegations in his complaint,

20  and as discussed in the Court's screening order (Doc. 16 at 14-15), Plaintiff states a cognizable

21  claim of discrimination under the ACA.

22  **E.  Mootness of Constitutional and ACA Claims**

23  Defendants argue that, even if Plaintiff states a cognizable constitutional or ACA claim,

24  the "claim is moot to the extent it is premised on policies which have since been revised." (Doc.

25  27-1 at 21.) Defendants point out that the 2018 version of the CCHCS/DHCS Guidelines "no

26  longer require the submission of a custody report" in reviewing an inmate's request for SRS, as

27  the 2016 version had, and that the guidelines "removed the requirement that the inmate-patient

28  have two years remaining on his/her sentence." (*Id.* at 22.)

18

"A moot action is one where the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (internal quotation marks and citations omitted). As discussed in subsection A, *supra*, "[t]he basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Id.* (citation omitted).

As Plaintiff notes, many of the policies on which his claims rest are still in place. (Doc. 34 at 16-17.) Inmate-patients whose requests for SRS are denied must still wait a full year to renew their requests, regardless of whether SRS becomes medically necessary in the interim; patients' medical providers are still prohibited from opining on whether SRS is medically necessary; officials must still consider patients' housing arrangements when reviewing SRS requests; and non-medical custody staff may still provide input when officials are deciding whether to grant an SRS request. (*See* Doc. 27-2 at 38-41.) More generally, Plaintiff contends that he is still being unconstitutionally denied SRS that is medically necessary. (*See* Doc. 34 at 17.) Thus, the issues Plaintiff raises are still "live," and there remains a present controversy as to which the Court can fashion relief. Plaintiff's claims, therefore, are not moot.

**F.  Immunity**

Defendants contend that CDCR and CCHCS "are immune from suit under the Eleventh Amendment." (Doc. 27-1 at 26.) The Court already addressed this issue in its screening order (Doc. 16 at 15-16) and disagrees.

The Eleventh Amendment bars suits against the state or arms of the state "unless Congress has abrogated state sovereign immunity under its power to enforce the Fourteenth Amendment or a state has waived it." *Holley v. California Dep't Of Corr.*, 599 F.3d 1108, 1111 (9th Cir. 2010) (citation omitted). A state may waive its immunity "by accepting federal funding that was conditioned on . . . a waiver." *Id.* Such a condition is contained within 42 U.S.C. § 2000d-7, which provides that a "State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of . . . title IX . . . or the provisions of *any other* Federal statute prohibiting discrimination by recipients of Federal financial assistance." (emphasis added). Thus, by receiving federal funds as Plaintiff alleges (Doc. 15 at 25), CDCR and CCHS waived their

immunity from suit for violations of ACA's nondiscrimination provision. *See Boyden v. Conlin*, 341 F. Supp. 3d 979, 998-99 (W.D. Wis. 2018) ("State's acceptance of federal funds acts as a waiver of immunity" from suit for violations of section 1557 of the ACA). In their reply, Defendants no longer dispute that "immunity is waived as to a claim brought under the ACA if [CDCR and CCHCS] have accepted federal funds under the Act." (Doc. 38 at 7.)

### G.   *Plata v. Newsom*

Lastly, Defendants argue that Plaintiff's "claim for injunctive relief seeking to revise CDCR's SRS policies is barred by the *Plata v. Newsom* class action." (Doc. 27-1 at 22.) Citing *Pride v. Correa*, 719 F.3d 1130, 1137 (9th Cir. 2013), Defendants concede that Plaintiff's claim for individual injunctive relief on behalf of himself is not barred by membership in the *Plata* class. (*See* Doc. 27-1 at 22-23.) However, Defendants argue that Plaintiff's "claim for injunctive relief seeking systemic reform" is barred by *Plata*. (*Id.* at 25.)

In *Crawford v. Bell*, the Ninth Circuit held that when a plaintiff in one case is a member of a separate class action, "a district court may dismiss 'those portions of [the] complaint which duplicate the [class action's] allegations and prayer for relief.'" *Pride*, 719 F.3d at 1133 (quoting *Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979)). However, the "court may not 'dismiss[ ] those allegations of [the] complaint which go beyond the allegations and relief prayed for in [the class action].'" *Id.* (quoting *Crawford*, 599 F.2d at 893).

To determine whether Plaintiff's claim for systemic reform duplicates *Plata*, the Court "must first identify the relief sought and obtained by *Plata*." *Id.* at 1134. The *Plata* class "'consists of all prisoners in the custody of the [CDCR] with serious medical needs, except those incarcerated at Pelican Bay State Prison.'" *Id.* (quoting Stip. for Inj. Relief ("Stip.") ¶ 8). In 2002, the U.S. District Court for the Northern District of California approved the Stipulation for Injunctive Relief, *id.*, which the Court judicially noticed in section III.A, *supra*. Per the stipulation, "CDCR was required to implement the following practices and procedures: (1) hire medical staff; (2) staff registered nurses at emergency clinics 24 hours a day; (3) implement certain protocols and systems including protocols for inter-institution transfers and for treatment; and (4) provide special diets for patients with end-stage liver and kidney failure." *Id.* (citing Stip.

¶¶ 5-6). Per the stipulation, the *Plata* "action alleges that plaintiffs are not receiving constitutionally adequate medical care as required by the Eighth Amendment . . . and that defendants are not complying with the Americans with Disability Act . . . and . . . the Rehabilitation Act." Stip. ¶ 2 (Doc. 27-2 at 115). According to its terms, "the intent of [the] Stipulation [was] to require defendants to provide only the minimum level of care required under the Eighth Amendment." Stip. ¶ 4.

In 2006, "[a]fter the 'State failed to comply with [the stipulated] injunction,' the district court appointed a receiver to oversee remedial efforts in the California prisons." *Pride*, 719 F.3d at 1134 (quoting *Brown v. Plata*, 563 U.S. 493, 507 (2011)). Per the Order Appointing Receiver (which the Court also judicially noticed), the "Receiver shall provide leadership and executive management of the California prison medical health care delivery system with the goals of restructuring day-to-day operations and developing . . . a . . . system that provides constitutionally adequate medical care to all class members as soon as practicable." Order Appointing Receiver 2:11-14 (Doc. 27-2 at 134).

In 2009, the *Plata* court "found that the . . . litigation's remedial efforts including the . . . Stipulation and the receivership had failed to remedy the constitutional violations in California prisons." *Pride*, 719 F.3d at 1134 (citing *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 914-15 (E.D. & N.D. Cal. 2009)). The court thus convened a three-judge panel to consider a prison-release order. *Id.* (citing *Coleman*, 922 F. Supp. 2d at 914-15). The three-judge court concluded that overcrowding made it "'impossible to provide constitutionally compliant care to California's prison population;'" thus, it "ordered that defendants reduce the prisoner population to 137.5% of the design capacity of the state's prisons . . ." *Id.* at 1135 (citing *Coleman*, 922 F. Supp. 2d at 949, 962).

In this action, in addition to seeking medically necessary surgery for himself, Plaintiff seeks "injunctive relief declaring CDCR and CCHCS policies regarding SRS as a treatment for gender dysphoria . . . unconstitutional on its [sic] face and as applied to Plaintiff." (Doc. 15 at 27.) Defendants contend that such systemic relief would duplicate the relief provided in *Plata*. (Doc. 27-1 at 25.) They point to the Thirty-first Tri-Annual Report of the Federal Receiver (which the

Court also judicially noticed), wherein the receiver reported on SRS-related policies. (*Id.* at 24-25.) The report states:

> CCHCS and CDCR have been engaged in discussions regarding how best to address the needs of transgender patients who have Gender Dysphoria (GD). . . .
>
> Some GD patients request Sex Reassignment Surgery (SRS) as part of their treatment plan. SRS is a generally accepted treatment in appropriate cases, and SRS is now a covered service under both Medicare and Medi-Cal, when medically necessary.
>
> Section 3350 of Title 15 of the California Code of Regulations also applies a medical necessity standard for the determination of appropriate health care. Section 3350.1 excludes certain types of SRS procedures but also provides a mechanism for providing those procedures, when specified criteria are met. In October 2015, CCHCS and DHCS issued a Supplement to the GD Care Guide, to provide guidelines for the review of SRS requests. . . . These guidelines established the Sex Reassignment Surgery Review Committee (SRSRC) as a subcommittee of the Headquarters Utilization Management Committee to review transgender inmate requests for SRS. The SRSRC is thoughtfully and carefully reviewing submitted materials and cases to ensure that all appropriate factors are considered for each case.

Thirty-first Tri-Ann. Rep. 6-7 (Doc. 27-2 at 153-154). The report, issued in 2016, thus provided a general update about the issuance of the first SRS Guidelines and the establishment of the SRSRC. The report also noted that state regulations govern certain SRS procedures.

Plaintiff argues that his claim for systemic relief does not duplicate *Plata* because it is premised on alleged violations of the Equal Protection Clause of the Fourteenth Amendment, whereas the *Plata* claims are based on alleged violations of the Cruel and Unusual Punishments Clause of the Eighth Amendment, the ADA, and the Rehabilitation Act. (Doc. 34 at 18-19.) Plaintiff contends, moreover, that his requested relief—"declaratory and injunctive relief declaring the SRS policies unconstitutional under the Equal Protection Clause—is not available in the *Plata* class action." (*Id.* at 20.)

Defendants counter by arguing that "regardless of the theory of liability upon which the claims are brought, the ultimate relief sought is the same—revision of CDCR's SRS policy." (Doc. 38 at 6.) Defendants contend that the *Plata* "Receiver oversees CDCR's medical policies, including the SRS policy," and thus granting Plaintiff's requested relief "would necessarily impose on the *Plata* Court and Receiver's jurisdiction." (*Id.*)

22

The Court is not aware of a case that directly addresses the issue of the extent to which an action's theory of liability determines whether the action duplicates a class action. The focus of *Crawford* is on *allegations* and requested *relief*. *See* 599 F.2d at 893 (court erred . . . in dismissing those allegations of [plaintiff's] complaint which go beyond the allegations and relief prayed for in" the class action). In *Crawford*, the Ninth Circuit affirmed the dismissal of the plaintiff's claims concerning "various constitutional and statutory violations arising from overcrowding" at the prison, but it reversed the dismissal of his claims regarding unsanitary conditions, the availability of adequate legal resources, and the effect of overcrowding on visiting privileges. *Id.* at 892-93. The court also reversed the dismissal of the requested relief that "exceed[ed] the relief sought" in the class action, the former of which included an order to direct the defendants "to begin a program of conjugal visits." *Id.* Thus, the same systemic issue, overcrowding, related to claims that the court found duplicative *as well as* to claims that the court found *not* to be duplicative. Whether the claims were duplicative was determined by whether they were based on differing allegations or sought different relief.

In *Pride*, the Ninth Circuit focused specifically on the relief sought. The court found that "a discrete, individual claim for injunctive relief" does not duplicate a "class action seek[ing] systemic reform." 719 F.3d at 1137. The court reasoned that "[i]ndividual claims for injunctive relief related to medical treatment are discrete from the claims for systemic reform addressed in *Plata*." *Id.* The court thus reversed the district court's dismissal of the plaintiff's claim for "an injunction preventing [the d]efendants from denying him medical treatment," even though the claim was "relat[ed] to the same general subject matter" of *Plata*. *Id.* at 1137-38.

Conversely, a "court may decline to exercise its jurisdiction over a . . . prisoner's claim seeking systemic injunctive relief related to medical care where the allegations and relief sought are duplicative of *Plata*." *Id.* (citations omitted) (emphasis removed). Thus, unlike claims for individual relief, claims for systemic relief *may*, but not necessarily, duplicate *Plata*. That is, per *Pride*, a court may dismiss an inmate's medical-related claims if (1) the inmate seeks systemic injunctive relief *and* (2) the inmate's allegations and relief sought duplicate *Plata*. In other words, fulfilment of the first condition does not necessarily indicate the fulfillment of the second.

23

1       Based on Plaintiff's operative complaint and the First Amended Complaint in *Plata*, as

2   well as the *Plata* Stipulation for Injunctive Relief, it does not appear that Plaintiff's request for

3   systemic relief and associated allegations duplicative those in *Plata*. Regarding his allegations,

4   Plaintiff claims that as a matter of policy, "CDCR requires . . . transgender and other non-cis-

5   gender prisoners seeking treatment for gender dysphoria to undergo a different and much more

6   onerous process than the one required of cisgender inmates seeking the same procedures." (Doc.

7   15 at 23.) He also alleges that the "regulatory scheme is facially discriminatory against

8   transgender and non-cisgender prisoners seeking treatment for gender dysphoria," and that

9   Defendants applied the policies "in a manner that discriminated against Plaintiff on the basis of

10  his gender and transgender status." (*Id.*) Plaintiff contends that Defendants thereby violated the

11  Equal Protection Clause of the Fourteenth Amendment. (*Id.* at 23-25.) Based on these allegations,

12  Plaintiff requests that the Court "[e]nter injunctive relief declaring CDCR and CCH[C]S policies

13  regarding SRS as treatment for gender dysphoria . . . unconstitutional on its [sic] face and as

14  applied to Plaintiff." (*Id.* at 27.)

15      In the *Plata* First Amended Complaint, on the other hand, the plaintiff-class alleges that

16  medical care in California prisons violates the Cruel and Unusual Punishments Clause of the

17  Eighth Amendment. First Am. Compl. ¶ 192 (Doc. 27-2 at 101). More specifically, the plaintiff-

18  class alleges the following with respect to California prisons: there "are insufficient numbers of

19  qualified medical staff;" there "is a lack of training and supervision of medical personnel;"

20  "[p]risoners' medical records are disorganized and incomplete;" there "is a lack of adequate

21  medical screening of incoming prisoners;" there "are lengthy delays in accessing care;" there "are

22  frequent failures to provide prisoners with access to care altogether;" "medical tests are frequently

23  delayed, never done, or not reported;" there "is untimely response to emergencies;"

24  "[c]orrectional officers frequently interfere with the provision of medical care;" there "is a lack of

25  quality control procedures;" there "is a lack of established protocols for dealing with chronic

26  illnesses such as diabetes, heart disease, hepatitis and HIV;" "[p]risoners are not informed of

27  potential side effects of prescribed medications;" "[n]ecessary medical care is often denied based

28  . . . on an inmate's expected release date;" "[d]efendants lack sufficient knowledge about the

1    medical care system to properly monitor and improve the delivery of medical care;" and, the

2    "administrative grievance system often does not provide timely or adequate responses to

3    complaints about medical care." First Am. Compl. ¶ 192 (Doc. 27-2 at 101-104.) Based on these

4    allegations, the plaintiff-class requests that the court declare the policies described in the

5    complaint as violative of the Eighth Amendment, and that the court "enjoin defendants . . . from

6    subjecting [it] . . . to the[se] unconstitutional . . . policies." First Am. Compl. 66:24-27, 67:2-7.

7            Nowhere in the *Plata* First Amended Complaint do the plaintiffs allege that state

8    regulations or CDCR policies are facially discriminatory, or that prison officials have

9    discriminated against them based on their gender or transgender status. The plaintiffs do not

10   mention gender dysphoria, let alone contend that CDCR officials subject transgender inmates

11   seeking SRS as treatment for gender dysphoria to more onerous policies than cisgender inmates

12   seeking similar procedures. More generally, the plaintiffs do not request injunctive or declaratory

13   relief that deems state regulations or CDCR policies as violative of the Equal Protection Clause,

14   either on their face or as applied to the plaintiffs.

15           The *Plata* Stipulation for Injunctive Relief, as well, does not mention gender dysphoria or

16   SRS or seek relief declaring regulations or policies as unconstitutional under the Equal Protection

17   Clause. *See generally* Stip. (Doc. 27-2 at 114-131). The stipulation provides that "nothing in [it]

18   shall be construed to require more of the defendants than is necessary to enforce the Eighth

19   Amendment of the United States Constitution." Stip. ¶ 4. Plaintiff, as stated, requests that SRS

20   policies be deemed unconstitutional under the Equal Protection Clause of the Fourteenth

21   Amendment. The contrast is more than a mere difference in theories of liabilities without

22   practical implication. The Eighth Amendment prohibits deliberate indifference to prisoners'

23   serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Equal Protection Clause

24   "directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S.

25   202, 216 (1982) (internal quotation marks and citation omitted). It is possible for prisoner health

26   care to meet the constitutional floor set by the Eighth Amendment, i.e., to not constitute cruel and

27   unusual punishment, while still failing to satisfy the mandate of the Equal Protection Clause to

28   treat similarly situated persons alike, e.g., by placing more onerous procedures on a protected

1    class without adequate justification. In this regard, it appears that Plaintiff's requested relief

2    "go[es] beyond the . . . relief prayed for" in *Plata*. *Crawford*, 599 F.2d 893. Relatedly, nothing

3    before the Court suggests that Plaintiff could seek an order declaring SRS policies as violative of

4    the Equal Protection Clause via the *Plata* class action.

5            Conversely, unlike the Stipulation for Injunctive Relief, the request for relief in this action

6    does not concern the hiring or training of medical staff, special diets for patients with particular

7    conditions, or protocols related to inter-institution transfers. (*See* Doc. 15 at 27.) Thus, aside from

8    the fact that both actions seek reform of medical care in California prisons, the requested relief in

9    this action and the relief sought or obtained in *Plata* are not identical. *Cf. Wilson v. Brown*, No.

10   3:05-cv-01774-BAS-MDD, 2015 WL 8515412, at *5 (S.D. Cal. 2015) (finding that plaintiff's

11   request for "measures to reduce the incidence and severity of valley fever" was duplicative of

12   *Plata*, since the latter already "include[d] claims for injunctive relief to reduce" such incidence

13   and "the *Plata* court [had] ordered . . . CDCR to exclude from certain prisons inmates who are at

14   high risk for developing severe valley fever"); *Gary v. Hawthron*, No. 3:06-cv-01528-WQH-PCL,

15   2007 WL 2781098, at *3, 5 (S.D. Cal. 2007) (recommending dismissal of "claims for . . . relief in

16   the form of better medical staffing and screening procedures because these issues ha[d] been

17   resolved" by *Plata*).

18           Pointing to the *Plata* receiver's Thirty-first Tri-Annual Report, Defendants contend that

19   the SRS policies were "drafted under [the] direct supervision of the Receiver. . . ." (Doc. 27-1 at

20   25.) However, from the brief update on SRS policies provided in the report (quoted above), it is

21   unclear whether this is actually the case, or whether instead the receiver was simply reporting on

22   policies under his general purview but for which he has no direct or substantive supervisory role.

23   More to the point, it is unclear whether the reported-on SRS policies are being sought or obtained

24   *by* the *Plata* litigation, or whether instead they are policies that the receiver oversees in a general

25   sense in his role as manager of the prison heath care system, *see* Order Appointing Receiver 2:11-

26   17, but that are not being litigated or mandated in any way by *Plata*. The receiver's report,

27   moreover, provides that state regulations (as opposed to *Plata* or the receivership) govern certain

28   SRS procedures. Thirty-first Tri-Ann. Rep. 7.

Based on the foregoing, the Court declines to recommend dismissal of Plaintiff's claim for systemic relief at the pleading stage. Defendants have not sufficiently demonstrated that Plaintiff's allegations and requested relief are duplicative of *Plata*.

The Court does not, however, decide the matter conclusively. To ensure that it avoids "concurrent litigation and potentially inconsistent results," *Pride*, 719 F.3d at 1137, the Court may revisit the matter if appropriate and with a fuller record. Here, the Court only finds that, based on the materials currently under its consideration, i.e., the pleadings and the documents that it has judicially noticed, Plaintiff's claim for systemic relief appears to go beyond the allegations and relief sought in *Plata*. *See Crawford*, 599 F.2d at 893.

## VI.   CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS that Defendants' motion to dismiss (Doc. 27) be DENIED. These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 21 days of the date of service of these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may result in waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 15, 2021**                           **/s/ Jennifer L. Thurston**
                                          CHIEF UNITED STATES MAGISTRATE JUDGE